UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 5:22-cr-00016-GFVT-MAS-1 |
| ) | |
| BILLY J. WILKINS, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

**REPORT & RECOMMENDATION**

Before the Court is Defendant Billy J. Wilkins's ("Wilkins") motion to suppress. [DE 25]. Wilkins seeks to suppress all evidence and statements made during a search of his residence by the Jessamine County Sheriff's Department ("JCSD") on November 4, 2021. [DE 25, Page ID# 81]. The Court held an evidentiary hearing on the matter on October 13, 2022, at which the United States presented five JCSD officers as well as certain exhibits related to the search. Having thoroughly considered the record and the parties' arguments, the Court recommends the District Judge deny Wilkins's motion.

      **I.**  **FACTUAL BACKGROUND**

On November 4, 2021, JCSD deputies obtained a search warrant, signed by a state-court judge, authorizing the search of Wilkins's residence and seizure of narcotics and related paraphernalia items. A team of JCSD deputies executed the warrant that day, arriving at Wilkins's residence with several tactical vehicles. All but one deputy was equipped with a tactical rifle and wearing tactical marked uniforms. Upon arrival, approximately six deputies approached the front

1

of the house while two or three deputies approached the rear of the house. Deputies also deployed a drone to record video of the outside of Wilkins's residence.

Upon the deputies' arrival, Sheriff Anthony Purcell, accompanied by at least two other deputies, approached the front door of the house, positioning themselves on the front porch. Sheriff Purcell slapped the wood next to the door jam with an open palm three or four times, announced that he was from the JCSD, that he had a search warrant, and that the occupants should come to the door. Sheriff Purcell gave this announcement a couple of times. Another deputy, operating a PA speaker system attached to a police vehicle parked in front of Wilkins's house, gave a similar announcement, stating that deputies were from the JCSD, that deputies had a search warrant for Wilkins's residence, and that occupants should come to the door. Deputies situated at the back of the house could hear the PA system announcements.

After Sheriff Purcell slapped the door frame and announced his presence, Deputy Mitchell, who was also positioned on the front porch, observed a female (through a window in the door) approach the front door. Deputy Mitchell and Sheriff Purcell yelled for the female to open the front door, and Mitchell heard a clicking noise consistent with the female locking the door. Shortly after hearing the locking noise, the deputy operating the drone announced that a male exited the rear door of the residence. Deputies situated at the back of the house identified themselves as JCSD deputies and yelled for the person exiting the door to show his hands. After the person retreated into the house, Sheriff Purcell and the other deputies situated at the front of the house breached the front door. Based on the CAD Detail Report [Gov. Exhibit 2], deputies arrived on the scene at approximately 5:37 p.m. and breached the front door at approximately 5:39 p.m.

After breaching the door, deputies encountered Wilkins and a female inside the house. Deputies placed handcuffs on Wilkins and brought him and the female to the front porch. Deputy

2

Arnold and Deputy Bruner stood with Wilkins and the female on the front porch while other deputies continued to search the house. Deputies repositioned Wilkins's handcuffs to the front of his body so that Wilkins could smoke a cigarette.

While on the front porch, Deputy Arnold read *Miranda* warnings to both Wilkins and the female at the prompting of Deputy Bruner. Deputy Arnold testified that he read the *Miranda* warnings from a card so he would not forget any portion of the warnings.[1] He stated that he read the warnings to both Wilkins and the female at the same time, first making eye contact with the female and then switching to make eye contact with Wilkins while reading the *Miranda* warnings. Deputy Arnold testified that, after reading the *Miranda* warnings and being asked if he understood his rights, Wilkins nodded up and down and verbally responded in the affirmative that he understood his rights, although he could not remember the exact phrase Wilkins said. Deputy Arnold noted in a supplement to his report from that day, [Gov. Exhibit 7], that Wilkins verbally stated that he understood his rights. Arnold could not recall either questioning Wilkins or whether Wilkins made any statements in his presence after or before being read *Miranda* warnings.

Deputy Bruner recalled additional details. Per Bruner, he prompted Deputy Arnold to read *Miranda* warnings to Wilkins because Wilkins began making statements concerning his ownership of any evidence found inside the house. Deputy Bruner testified that Wilkins made statements both before and after Deputy Arnold read the *Miranda* warnings. Deputy Bruner also testified that, immediately after Deputy Arnold read the *Miranda* warnings, he asked Wilkins what deputies were going to find inside the residence. In response to this question, Wilkins stated that there were

---

[1] The card, admitted into evidence as Gov. Exhibit 6, accurately reflects the *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.")

3

guns in the living room ottoman inside the house. Deputies then searched the ottoman and located a revolver handgun. [*See* DE 25-2 (Search Warrant Return)]. Deputy Bruner testified that he did not ask Wilkins any other questions.

In addition to the firearm found in the ottoman, deputies uncovered a firearm under a bathroom sink, trafficking quantities of fentanyl and methamphetamine, and scales in the kitchen. [DE 25-2 (Search Warrant Return)].

## II.   ANALYSIS

Wilkins advances three arguments in support of suppressing evidence or statements during the search. First, Wilkins asserts that officers executed the search warrant without knocking and announcing their presence in violation of federal and Kentucky state law. Second, he argues that the two firearms from his residence must be suppressed because the search warrant did not authorize their seizure. And third, he argues that any statements he made after officers took him into custody must be suppressed because he did not knowingly and voluntarily waive his *Miranda* rights. The Court addresses, and rejects, each argument below.

### A.   JCSD DEPUTIES INDISPUTABLY KNOCKED AND ANNOUNCED THEIR PRESENCE.

In his motion, Wilkins asserts that JCSD deputies unlawfully executed the search warrant in violation of both the Fourth Amendment and Kentucky state law because, despite the search warrant not authorizing a no-knock execution, deputies executed the search warrant without first knocking and announcing their presence. Specifically, Wilkins argues that doing so violates Kentucky Revised Statute (KRS) 455.200(b), which provides the requirements under which a no-knock search warrant must be obtained and executed in Kentucky.[2] Wilkins also argues that the

---

[2] KRS 455.200 establishes certain factors that must be present for a no-knock warrant to issue. That statute further requires officers executing a no-knock warrant to wear body-worn cameras and record the entirety of the execution of the warrant. KRS 455.200(b). Kentucky Rule

4

deputies' no-knock execution of the search warrant violates the Fourth Amendment because the warrant did not authorize such an entry. *See United States v. Smith*, 386 F.3d 753, 758 (6th Cir. 2004) ("Failure to knock and announce prior to forcibly entering a location to execute a search warrant, absent exigent circumstances, is unreasonable under the Fourth Amendment").

The problem with Wilkins's argument, however, is that the record conclusively established that JCSD deputies first knocked on the front door, identified themselves, and stated their purpose for demanding entry before forcibly entering Wilkins's residence. Sheriff Purcell testified that he slapped the door frame multiple times and announced that he was with the JCSD and that he had a warrant to search the home. The officer operating the PA system did the same. In fact, deputies only resorted to entering Wilkins's residence forcibly after they observed a woman on the other side of the door and then heard a noise consistent with door being locked.

At the hearing, Wilkins asserted that deputies' testimony that they knocked and announced their presence before forcibly entering Wilkins's residence was essentially unbelievable. In support of his argument, Wilkins noted that the CAD Report omitted that deputies knocked and announced themselves. [Defendant's Exhibit 1]. However, Wilkins offered no evidence contradicting that of the deputies, and the Court finds that both the after-action report and the CAD timeline do not contradict deputies' version of events. Faced with the deputies' uncontradicted testimony, the Court finds their version of events credible. Thus, this uncontradicted testimony forecloses Wilkins's argument that the deputies exceeded the scope of the warrant by failing to knock and announce their presence. *See id*. ("The requirement that law enforcement officers executing a search warrant at a person's home first knock and identify themselves, state their

---

of Evidence 410A further provides that, notwithstanding certain narrow exceptions, evidence seized in violation of the no-knock requirements shall be excluded from trial.

purpose for demanding entry, and allow the occupants time to open the door before forcibly entering has been established by the Supreme Court.") (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)). Accordingly, the suppression of any evidence is not warranted on this basis.

**B.    SUPPRESSION OF THE FIREARMS IS NOT WARRANTED BECAUSE THEY WERE IN PLAIN VIEW.**

Wilkins next argues that the Court should suppress the two firearms found in his residence because their seizure was not specifically authorized by the search warrant. The search warrant authorized the seizure of the following items:

> Marijuana, heroin, fentanyl, methamphetamine, and any other controlled substances, any notes, letters, writings, photos, documents, cell phones, paper records, computer or electronic records, and any proceeds derived from the illegal trafficking in a controlled substances, scales, or any other paraphernalia which would indicate the illegal use of, possession of, or trafficking in a controlled substance.

[DE 25-2 (Search Warrant), Page ID # 96]. Wilkins asserts that the above-quoted language does not sufficiently identify firearms. Specifically, he argues that the warrant's authorization of "other paraphernalia which would indicate the illegal use of, possession of, or trafficking in a controlled substance[,]" is overbroad and should therefore be severed from the remaining provisions of the warrant. In the alternative, Wilkins asserts that "other paraphernalia" does not independently authorize the seizure of firearms.

In response, the United States asserts that the search warrant authorized the seizure of the firearms because the search warrant affidavit noted that Wilkins's residence may contain either property or things used as a means of committing a crime or evidence tending to show a crime has been committed. Even ignoring the search warrant itself, the United States argues the seizure of firearms was lawful because the firearms were reasonably related to Wilkins's drug trafficking offenses. *See United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) ("[E]ven evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed

6

the basis for the search warrant.") (citation and quotation marks omitted). And, alternatively, the United States argues that the plain view exception to the warrant requirement authorized the seizure of the firearms.

Setting aside the issue of whether the warrant authorized the seizure of firearms in Wilkins's residence, the Court finds that the plain view exception to the warrant requirement authorized the seizure of the two firearms.

"It is well-established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). But, four factors must be satisfied in order for the plain view exception to apply: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)).

In the present case, the first, second, and fourth factors can be quickly resolved. Both the firearm located under the bathroom sink and the firearm located in the living room ottoman came into plain view when deputies searched Wilkins's residence for evidence of drug crimes. Deputies were "lawfully in [the] position from which they viewed [the firearms,]" *Hopkins v. Nichols*, 37 F.4th 1110, 1117 (6th Cir. 2022), because they were executing a search warrant of Wilkins's residence. The search warrant authorized the seizure of drugs and drug paraphernalia, both of which could reasonably fit in a bathroom sink cabinet and an ottoman drawer. *See United States v. Ross,* 456 U.S. 798, 820–21 (1982) (holding warrant authorizes officer to search areas and containers in which the named contraband might be found). Moreover, deputies had a right to access the firearms from their legal position inside Wilkins's residence. *See Boone v.*

7

*Spurgess,* 385 F.3d 923, 928 (6th Cir. 2004) ("The final requirement, that the officer have a lawful right of access to the object, is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises.").

The third factor—whether the firearms' incriminating nature was immediately apparent—is also met. Determining whether an item's incriminating nature is immediately apparent "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" *United States v. Calloway,* 116 F.3d 1129, 1133 (6th Cir. 1997) (quoting *Texas v. Brown,* 460 U.S. 730, 741–42 (1983)). The Court considers the following factors, none of which is determinative, to assess whether probable cause is immediately apparent upon viewing an object:

> 1) a nexus between the seized object and the items particularized in the search warrant, 2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity, and 3) whether the . . . officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002). Given the Sixth Circuit's view that guns are well-recognized tools of drug trafficking, there is a plain nexus between the firearms and the drugs and drug paraphernalia items identified in the search warrant. *See United States v. Moreno,* 658 F.2d 1120 (6th Cir. 1981) (quoting *United States v. Korman,* 614 F.2d 541, 546 (6th Cir.) *cert. denied*, 446 U.S. 952 (1980)) ("Dealers in narcotics are well known to be dangerous criminals usually carrying firearms."). And, "while the 'intrinsic nature' of a firearm does not automatically give rise to probable cause of criminality," *United States v. Salto-Garcia*, No. 5:18-cr-44-REW, 2018 WL 3064279, at *5 (E.D. Ky. June 21, 2018), the third factor, on these facts, clearly applies. 18 U.S.C. § 924(c)(1)(A) criminalizes using, carrying, or possessing a firearm during and in relation to a drug trafficking crime   The searching deputies uncovered a large

8

quantity of drugs and drug paraphernalia in Wilkins's residence, and the firearms were found in concealed locations within the residence. Given the context of the search and the large amount of drug-trafficking evidence found in the residence, the deputies could determine there was probable cause of the firearms' incriminating nature. "Because evidence of drugs and drug paraphernalia were found during the execution of the warrant, any firearms in plain view were also seizable contraband under the 'plain view exception' to the specificity warrant requirement." *See United States v. Edwards*, No. 4:10–CR–00018, 2011 WL 582625, at *3 (W.D. Ky. Feb. 9, 2011). As such, the four requirements of the plain view exception are satisfied, so application of this doctrine validates the seizure of the two firearms.

Wilkins argued in both his reply brief [DE 29] and at the hearing that the plain view exception does not justify seizure of the two firearms because deputies did not inadvertently discover the firearms during their search. Specifically, at the hearing, Wilkins pointed both to testimony that he directed deputies to the firearm found in the living room ottoman and to evidence which, in his view, demonstrated that deputies expected to find firearms in Wilkins's residence.[3]

The Court disagrees, as "inadvertent discovery" is no longer a requirement of the plain view exception. In *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), the Supreme Court's plurality opinion outlined the requirements of the plain view exception, stating "that the discovery of evidence in plain view must be inadvertent." *Id*. at 469. However, the Supreme Court later "modified that rule in *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L.Ed.2d 112 (1990), by dispensing with the 'inadvertency' prong of the test." *United States v. Yates*, 132 F.Supp.2d 559, 567 (E.D. Mich. 2001). The Court reasoned that *Coolidge's* inadvertent-discovery

---

[3] On this point, Wilkins pointed primarily to the fact that deputies had indicated that firearms and a criminal history of firearms were present factors in the JCSD Risk Assessment report. [*See* Defendant's Exhibit 2 (Risk Assessment Report)].

requirement improperly injected consideration of the officer's subjective state of mind into the search and seizure totality-of-the-circumstances analysis, which should instead focus on objective standards. *Horton*, 496 U.S. at 139. Moreover, the Court found that the stated purpose of the inadvertent-discovery requirement—to prevent officers from turning specific warrants into general warrants—was protected by the "requirements that no warrant issue unless it 'particularly describ[es] the place to be searched and the persons or things to be seized[.]'" *Id.* (citing *Maryland v. Garrison,* 480 U.S. 79, 84, (1987); *Steele v. United States No. 1,* 267 U.S. 498, 503 (1925)). Thus, the *Horton* court made clear that "even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition." *Id*. at 130.

Although the Sixth Circuit has, on more than one occasion since *Horton*, included the inadvertent-discovery requirement in its recitation of the plain-view exception requirements, *see United States v. Blakeney*, 942 F.2d 1001, 1028 (6th Cir. 1991); *United States v. Blair*, 214 F.3d 690, 698 (6th Cir. 2000), the Court has also acknowledged the elimination of the inadvertent-discovery requirement of the plain view doctrine. *See United States v. Bonds*, 12 F.3d 540, 571 n.2 (6th Cir. 1993) ("As the Government correctly points out, the Supreme Court has since eliminated the requirement that seizures in plain view by a "tag along" officer must be of evidence inadvertently discovered. . . . [A]ny discovery of incriminating evidence in plain view, whether or not the officer expects to find it in the course of a search, is admissible." (citing *Horton*, 496 U.S. 128)); *see also Garcia*, 496 F.3d at 515 (Moore, J., concurring) ("In *Horton*, . . . the Supreme Court changed tack and held that inadvertence is not a necessary condition for a plain-view seizure."); *United States v. Clancy*, 979 F.3d 1135, 1139 (6th Cir. 2020) ("Even though happenstance is often 'a characteristic' of 'legitimate "plain-view" seizures,' it is not required. The inquiry simply does not implicate the officer's state of mind."). Moreover, recent Sixth Circuit

opinions applying the plain view doctrine omit inadvertent discovery as an element. *See United States v. Pacheco*, 841 F.3d 384, 394-95 (6th Cir. 2016); *Hopkins v. Nichols*, 37 F.4th 1110, 1117 (6th Cir. 2022) (Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.") (citation and quotation marks omitted). As such, Wilkins's argument that deputies' subjective intent in search the areas which ultimately yielded the firearms in Wilkins's residence is without merit.

For these reasons, the Court finds the four requirements of the plain view exception are met. Deputies validly executed a plain view seizure of both firearms while executing the search warrant in Wilkins's residence. Accordingly, suppression of the firearms found in Wilkinson's residence is not warranted.[4]

---

[4] It is plausible that the seizure of the firearm found inside the living room ottoman is justified under the inevitable discovery exception to the warrant requirement, even assuming deputies were not permitted to search the ottoman with the intent to find the firearm. The inevitable discovery exception "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016). The exception applies when either (1) there is "'an independent, untainted investigation' that was bound to uncover the same evidence" or (2) when "'other compelling facts' demonstrate that discovery was inevitable." *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995)). For example, "[a]s long as the 'evidence discovered during [the] illegal search would have been discovered during a later legal search[,] and the second search inevitably would have occurred in the absence of the first,' then the evidence may be admitted." *Id.* (quoting *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002)).

However, it is the United States' burden of showing that the exception applies. *Nix v. Williams*, 467 U.S. 431, 444 (1984). In this case, the United States neither made the argument nor elicited any evidence that would lead the Court to believe the discovery of the firearm in the ottoman *would have* occurred during a later, lawful search had officers not already searched the ottoman with the intent to find a firearm. Maybe deputies would have later searched the ottoman for narcotics or other evidence identified in the warrant, but maybe not. Absent testimony on this issue, the Court does not know. As such, the Court is precluded from considering whether that the firearm seized in the living room ottoman is independently admissible under this theory. *See United States v. Gregory*, 497 F. Supp. 3d 243, 279 (E.D. Ky. 2020) (finding United States' failure to develop facts establishing that evidence would have been lawfully discovered precluded court

### C.  WILKINS WAS NOT SUBJECTED TO A CUSTODIAL INTERROGATION AT THE TIME HE MADE STATEMENTS TO JCSD DEPUTIES.

Finally, Wilkins argued that any statements he made to deputies during the execution of the search warrant must be suppressed.[5] The Fifth Amendment precludes an individual from being "compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. To help safeguard this right, the Supreme Court enacted the familiar prophylactic rule outlined in *Miranda*: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

There are two sets of statements at issue. First, Wilkins made statements prior to officers informing him of his *Miranda* rights. The issue here is whether Wilkins's statements were made in violation of his Fifth Amendment rights. Second, Wilkins made statements after his *Miranda* rights. The issue here is whether Wilkins answered those questions knowingly and voluntarily in waiver of his Fifth Amendment rights.

#### 1.  Pre-*Miranda* Statements

The *Miranda* rule applies only to custodial interrogations—*i.e.*, "questioning by a law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Maranian v. Jackson*, 14 F. App'x 310, 313 (6th Cir. 2001). A party seeking suppression of statements based on a *Miranda* violation is required to show by a preponderance of the evidence that he was subject to custodial interrogation. *United*

---

from considering inevitable discovery doctrine); *see also United States v. Ruckes*, 586 F.3d 713, 719 (9th Cir. 2009) ("It is the government's burden to show inevitable discovery, so its failure to make the argument prevents us from upholding the denial of the suppression motion on that theory.").

[5] The briefing does not address or request suppression of any particular statements. Rather, Wilkins's counsel stated at the hearing that he seeks suppression of any statements Wilkins made to deputies during the course of the November 4, 2021, search.

*States v. Lawrence*, 892 F.2d 80 (Table), 1989 WL 153161, at *5 (6th Cir. 1989). There is no dispute that Wilkins made statements to law enforcement prior to being read his *Miranda* rights. Rather, the issue is whether was subject to custodial interrogation such that his *Miranda* rights were triggered.

There is no dispute Wilkins was in custody. "A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation by the police and leave." *United States v. Hoyer*, 411 F. Supp. 3d 406, 408 (W.D. Ky. 2019). Wilkins was in handcuffs surrounded by law enforcement and detained as the search warrant was being executed. The United States does not contest this point.

The interrogation element, however, mandates the opposite conclusion. Interrogation includes both express questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[.]" *Id.* at 409 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Here, there is no evidence in the record whatsoever that Deputy Arnold or Deputy Bruner asked Wilkins any questions that prompted his statements pre-*Miranda*. According to Deputy Bruner, it was Wilkins's unsolicited statements that prompted him to ask Deputy Arnold to read Wilkins his *Miranda* rights. Because Wilkins was not subjected to custodial interrogation prior to Deputy Arnold reading the *Miranda* warning, suppression is not warranted for any statements made prior to his *Miranda* warning.

   2.   **Post-*Miranda* Statements**

The second set of statements occurred after Deputy Arnold informed Wilkins of his *Miranda* rights and were made in response to a question asked by Deputy Bruner. Wilkins argues these statements were not made in a voluntary and knowing waiver of his *Miranda* rights.

13

"Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole,* 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona,* 384 U.S. 436, 478–79 (1966)). "Such a wavier must be made voluntarily and free of any coercion." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (citing *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). In determining whether a *Miranda* waiver is voluntary, the Court employs a three-step analysis: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir. 1999). The United States "bears the burden of proving—by a preponderance of the evidence—the voluntariness of both an accused's *Miranda* waiver and confession." *Id*. (citing *Colorado v. Connelly,* 479 U.S. 157, 168–69 (1986)).

In the present case, Wilkins's argument is again overcome by the record. Wilkins pointed to the number of deputies at the scene and the fact that almost all of the deputies were carrying large rifles. Although true, the argument fails. While it is true that the presence of visibly armed officers in uniform is coercive, such coercion was insufficient to overcome Wilkins's will. Importantly, only two officers were present on the porch with Wilkins at the time he both verbally and physically indicated his understanding of his *Miranda* rights. Moreover, deputies allowed Wilkins to move his handcuffs to the front of his body so that he could smoke a cigarette. After making voluntary, unprompted statements and following a reading of his *Miranda* rights, Deputy Bruner asked Wilkins a single question to which he immediately responded. This is far from a scene where Wilkins was being grilled repeatedly over a long period of time, his will wore down.

Such facts do not rise to the level of coercion necessary to overcome Wilkins's free will to invoke or waive his *Miranda* rights. Any statements made in response to deputies' questions—which hearing testimony established took place only after Wilkins waived his *Miranda* rights, is not subject to suppression. The Court finds Wilkins voluntarily and knowingly waived his *Miranda* rights.

### III.  CONCLUSION

For the reasons discussed, the Court **RECOMMENDS** that the District Judge **DENY** Wilkins's Motion to Suppress [DE 25]. The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. Pursuant to the parties' agreement, [DE 31], within seven days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

Entered this the 19th day of October, 2022.

*[signature]*
MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY