UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:22-cr-00016-GFVT-MAS-1 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | & |
| BILLY J. WILKINS, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is before the Court on the Report and Recommendation filed by United States Magistrate Judge Stinnett addressing Defendant Billy Wilkins's Motion to Suppress [R. 25; R. 35.] Mr. Wilkins seeks to suppress firearms that police obtained during a search of his residence pursuant to a search warrant and statements that Mr. Wilkins made to police during the search. [R. 22.] Judge Stinnett recommends that the Court deny Mr. Wilkins's suppression motion. [R. 39.] The Court will **ADOPT** Judge Stinnett's Report and Recommendation for the following reasons.

**I**

In November 2021, the Jessamine County Sheriff's Department executed a search warrant for Defendant Billy Wilkins's residence. [R. 25-2.] The search warrant authorized the search and seizure of controlled substances, proceeds of drug trafficking, and scales and other paraphernalia. *Id.*

On arrival to the house, about six deputies approached the front while two or three deputies approached the back of the house. [R. 34 at 14-15.] Police then entered the house,

encountering Mr. Wilkins and his girlfriend inside.  Deputies placed handcuffs on Mr. Wilkins

and brought Mr. Wilkins and his girlfriend to the front porch outside the house.  *Id.* at 43, 95.

Deputy Arnold and Detective Bruner stood on the front porch with them while deputies searched

the house.  *Id.* at 68, 86.

Detective Bruner testified that while on the front porch, Mr. Wilkins began talking and

asking questions.  *Id.* at 88.  Detective Bruner interrupted Mr. Wilkins and told Deputy Arnold to

read Mr. Wilkins and his girlfriend the *Miranda* rights.  *Id.* at 88-89.  Deputy Arnold proceeded

to read the *Miranda* rights verbatim from a card.  *Id.* at 70.  The card itemized the rights and

included a question at the end to confirm that the person understood the rights.  *Id.*  While

Deputy Arnold read, the girlfriend stood, facing Mr. Arnold, and Mr. Wilkins sat next to her.  *Id.*

at 77.  Deputy Arnold looked at both Mr. Wilkins and his girlfriend while reading, though he

made eye contact with the girlfriend most of the time.  *Id.* at 77-78.  After finishing the card,

Deputy Arnold asked Mr. Wilkins if Mr. Wilkins understood his rights.  *Id.* at 70.  Deputy

Arnold stated that Mr. Wilkins immediately nodded and verbally confirmed that he understood.

*Id.* at 71.

Detective Bruner then asked Mr. Wilkins what police would find inside the house.  *Id.* at

94.  Mr. Wilkins responded, saying that a firearm was inside the ottoman in the living room.  *Id.*

Detective Bruner then entered the house and found the firearm in the living room ottoman.  *Id.*

In addition to the firearm found in the ottoman, police also found a firearm under a bathroom

sink, trafficking quantities of fentanyl and methamphetamine, and scales.  [R. 25-2 at 2.]

A grand jury indicted Mr. Wilkins on four counts, including drug and firearm charges.

[R. 1.]  Mr. Wilkins filed a suppression motion to exclude all evidence seized and statements

made by Mr. Wilkins during the search.  [R. 25.]  After considering the Motion to Suppress, the

response by the United States, and Mr. Wilkins's reply, Magistrate Judge Stinnett recommended that the Court deny Mr. Brown's Motion to Suppress. [R. 35.] Mr. Wilkins timely filed an objection to the Report and Recommendation. [R. 37]

## II

Mr. Wilkins objects to Judge Stinnett's Report on the grounds that the Report incorrectly concluded that police properly obtained testimony from Mr. Wilkins and firearms from his home. The Court reviews these objections to the Report de novo. 28 U.S.C. § 636(b)(1)(c).

## A

Mr. Wilkins first objects to the Report because the Report recommended to allow testimony that Mr. Wilkins made to police while the police searched his residence. Mr. Wilkins argues that the Report's analysis here fails for three reasons: the Report (1) incorrectly finds that Mr. Wilkins was not subject to custodial interrogation by police, (2) incorrectly concludes that Mr. Wilkins received his *Miranda* rights, and (3) incorrectly assumes that Mr. Wilkins made statements to police. [R. 37.]

## 1

The Fifth Amendment prohibits the government from compelling a criminal defendant to be a witness against himself. U.S. CONST. AMEND. V. This right is guarded by the rule provided by *Miranda v. Arizona*, which requires police to give warnings, including the right to remain silent, before conducting a custodial interrogation. 384 U.S. 436 (1966). But police need not provide *Miranda* warnings to everyone they question. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). A party seeking to suppress prior statements based upon a failure to receive *Miranda* warnings must demonstrate by a preponderance of the evidence that police subjected

the party to a custodial interrogation.  *United States v. Lawrence*, 892 F.2d 80, at *14-15 (6th Cir. 1989) (unpublished table decision).

A person is in custody if a reasonable person in the circumstances would not feel free to end the interrogation by police and leave.  *See United States v. Dickson*, No. 21-6176, 2022 U.S. App. LEXIS 18250, at *9 (6th Cir. June 29, 2022).  A person in custody is subjected to interrogation when police expressly question the person or when police use words or actions that the police "should know are reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Mr. Wilkins allegedly made statements to police twice: once before Deputy Arnold read *Miranda* warnings and once after.  The Report and Recommendation finds that Mr. Wilkins was in custody during the police search of his residence but that police did not interrogate Mr. Wilkins before Deputy Arnold read the *Miranda* warnings.  [R. 35 at 12-13.]  Mr. Wilkins argues that police subjected him to custodial interrogation during the entire encounter.  [R. 37 at 4.]  But he does not offer any evidence to demonstrate that police used any words or actions that would elicit his first statements.  Indeed, Detective Bruner testified that Mr. Wilkins's unsolicited first statements prompted Detective Bruner to interrupt so that Deputy Arnold could read the *Miranda* warnings.  [R. 34 at 86, 88.]  Because no evidence suggests that police used any words or actions that would elicit Mr. Wilkins's first statements, the statements were not made under custodial interrogation.  *See Innis*, 446 U.S. at 301.  Thus, the Report correctly concluded that the first should not be suppressed for failure to provide *Miranda* warnings.

Mr. Wilkins does provide evidence that police subjected him to custodial interrogation during his second set of statements.  [R. 37 at 4.]  Yet this does not contradict the Report.  The Report assumes that the second set of statements occurred during custodial interrogation but

4

concludes that the interrogation did not violate *Miranda*.  [R. 35 at 13.]  Thus, the Court turns to Mr. Wilkins's objection regarding the sufficiency of the *Miranda* warnings given.

**2**

Mr. Wilkins argues that police elicited his second set of statements in violation of the Fifth Amendment because he never sufficiently received *Miranda* warnings before being questioned.  [R. 37 at 2-3.][1]  Certainly, as Mr. Wilkins suggests, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" before questioning.  *J. D. B. v. North Carolina*, 564 U.S. 261, 269 (2011).  The person interrogated must be "clearly informed" of these rights.  *Miranda*, 384 U.S. at 471.  No amount of circumstantial evidence that the person was aware of these rights will suffice; only a warning will adequately assure that the person was aware of their rights.  *Id.* at 471-72.  However, the way police give *Miranda* warnings does not matter if the person understands the rights.  *See United States v. Tuggles*, 334 F. Supp. 383, 387 (E.D. Pa. 1971).

Accordingly, police may read *Miranda* rights to a group of individuals simultaneously as long as each person understands their rights.  *See, e.g.*, *United States v. Flores*, No. SA-10-CR-279, 2010 U.S. Dist. LEXIS 89359, at *14 (W.D. Tex. Aug. 30, 2010) (denying the motion to suppress where police read *Miranda* warnings to a group then asked each individual whether they understood); *People v. Williams*, 124 Ill. App. 3d 734, 738 (1984) (concluding that "advising a group of arrestees of their rights is proper legal procedure").  And similarly, police

---

[1] Specifically, Mr. Wilkins objects to the Report's undiscussed assumption that Deputy Arnold sufficiently read Mr. Wilkins warnings under *Miranda*.  To be sure, Judge Stinnett did not analyze whether Mr. Wilkins received sufficient warnings because Mr. Wilkins failed to raise the issue in his Motion to Suppress; Mr. Wilkins does not brief the issue until his objection to the Report and only suggests it briefly during the suppression hearing before the Magistrate.  [R. 25; R. 34 at 119; R. 37 at 2.]  Even still, the Court considers and rejects this argument.

need not make eye contact with a person while reading the *Miranda* rights to clearly inform the person of their rights.  *See, e.g.*, *United States v. Roberson*, 573 F. Supp. 3d 209, 240 (D.D.C. 2021) (holding that the police did not violate *Miranda* because the suspect "was engaged with police, although "not making eye contact with the agent" and "glancing around the room").

Here, the Report correctly concluded that Deputy Arnold adequately informed Mr. Wilkins of his rights under *Miranda*.  Deputy Arnold testified that he read *Miranda* warnings to Mr. Wilkins and his girlfriend on the front porch of the house.  [R. 34 at 75.]  Deputy Arnold read from a card that stated the *Miranda* rights and concluded with a prompt to ask the person if they understand their rights.  *Id.* at 70.  While Deputy Arnold read, the girlfriend stood, facing Mr. Arnold, and Mr. Wilkins sat next to her.  *Id.* at 77.  Deputy Arnold turned to look at both Mr. Wilkins and his girlfriend while reading, though he made eye contact with the girlfriend most of the time.  *Id.* at 77-78.  After finishing the card, Deputy Arnold asked Mr. Wilkins if Mr. Wilkins understood his rights.  *Id.* at 70.  Deputy Arnold further testified that, without hesitation, Mr. Wilkins then nodded his head and verbally responded in the affirmative.  *Id.*  at 77, 79.

Though Deputy Arnold read the *Miranda* rights to Mr. Wilkins and his girlfriend simultaneously and did not keep eye contact with Mr. Wilkins the entire time reading, Deputy Arnold clearly informed Mr. Wilkins of his rights by reading from the card and confirming that Mr. Wilkins understood his rights.  *See Flores*, 2010 U.S. Dist. LEXIS at *14; *Roberson*, 573 F. Supp. 3d at 240.  Mr. Wilkins provides no evidence contradicting Deputy Arnold's testimony that the card adequately reflected the *Miranda* rights, Deputy Arnold read aloud the card to Mr. Wilkins and his girlfriend, or Mr. Wilkins responded in the affirmative.  Thus, the Report correctly concluded that Mr. Wilkins was "clearly informed" of his *Miranda* rights before being questioned and making his second set of statements.  *Miranda*, 384 U.S. at 471.

**3**

In his objection to the Report, Wilkins, for the first time, makes two objections that contend Mr. Wilkins did not make the statements at issue.  Rather than being "factual findings" as Mr. Wilkins argues, these expressions were uncontested assumptions that are inapposite for an objection.  But to the extent that they are findings, they are accurate.

First, Mr. Wilkins contests the Report's expression that "Arnold could not recall either questioning Wilkins or whether Wilkins made any statements in his presence."  [R. 37 at 5.]  Yet this statement merely referenced Deputy Arnold's recollection for the Report's factual background.  [R. 35 at 3.]  Moreover, this expression in the Report accurately describes Deputy Arnold's testimony.  [R. 34 at 73.]  Thus, the Report's expression correctly reflects that Deputy Arnold testified that he could not recall questioning Mr. Wilkins or whether Mr. Wilkins made any statements with Deputy Arnold present.

Second, Mr. Wilkins objects to the Report's statement that "[t]here is no dispute that Wilkins made statements to law enforcement prior to being read his *Miranda* warnings."  [R. 37 at 6 (citing R. 35 at 13).]  Yet again, this was not a finding by Magistrate Judge Stinnett.  Instead, this statement is a description of the parties' positions presented to the Court.  Mr. Wilkins never seriously disputed the existence of statements made to police before Deputy Arnold read the *Miranda* rights.[2]  Therefore, to the extent that the Report found that the parties presented no dispute about pre-*Miranda* statements, the Report's expression is correct.

---

[2] In his motion to suppress, Mr. Wilkins refers to any statements he made to police before Deputy Arnold read the *Miranda* rights as "alleged statements."  But Mr. Wilkins never seriously argues that Mr. Wilkins did not make any statements.

**B**

Next, Mr. Wilkins objects to the Report's findings that the plain view doctrine of the Fourth Amendment permitted police to seize firearms found in Mr. Wilkins's home. [R. 37 at 7.] The Fourth Amendment provides the right to be secure against unreasonable searches and seizures. U.S. CONST. AMEND. IV. Although a search or seizure is more likely to be reasonable when sanctioned by a warrant, the law recognizes certain exceptions to this general warrant requirement. *See Horton v. California*, 496 U.S. 128, 134 (1990). The burden is on the United States to establish a valid exception to the Fourth Amendment justifying a warrantless search or seizure. *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971).

Under the plain view exception, a government agent may seize an object without first obtaining a warrant when four requirements apply: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton*, 496 U.S. at 136-37).

The first requirement asks whether the object could be seen in plain view by the seizing party. *See, e.g.*, *Hopkins v. Nichols*, 37 F.4th 1110, 1117 (6th Cir. 2022). Under the second requirement, a lawful search generally extends to the entire area in which the object of the search may be found. *See United States v. Ross*, 456 U.S. 798, 820-21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.").

For the third requirement, that the object's incriminating nature is apparent, courts consider the nexus between the seized object and the items in the search warrant, whether the

object itself causes officers to believe that it is associated with criminal activity, and whether the police can determine probable cause of the object's incriminating nature from the facts then available. *See United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002). The Circuit has identified firearms as tools of the trade of drug trafficking "almost to the same extent as they keep scales." *United States v. Moreno*, 658 F.2d 1120, 1123 (6th Cir. 1981) (internal quotation omitted). The final requirement guards against warrantless entry onto property when an object is viewed from off the property. *See Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004).

Here, the plain view exception applies to the police's seizure of the two firearms. First, the firearms under the bathroom sink and in the living room ottoman were in plain view when police searched the house for illegal drugs. [R. 34 at 62-63.] Second, officers were legally present in the living room and bathroom—where the firearms were found—because the lawful search extended to anywhere drugs could have been found, including in an ottoman and under the sink. *See Ross*, 456 U.S. at 820-21. Third, the firearms' incriminating nature was immediately apparent to police because of the nexus between the drugs police were seeking and firearms, which are tools of the trade, and the firearms' discreet locations. *See Moreno*, 658 F.2d at 1123; *see, e.g.*, *United States v. Edwards*, No. 4:10-CR-00018, 2011 U.S. Dist. LEXIS 12944, at *7-8 (W.D. Ky. Feb. 9, 2011) ("Because evidence of drugs and drug paraphernalia were found during the execution of the warrant, any firearms in plain view were also seizable contraband under the 'plain view exception' to the specificity warrant requirement."). Finally, police had a right of access to the firearms by being in the house legally. *See Boone*, 385 F.3d at 928.

Mr. Wilkins objects to the Report's conclusion that police seized firearms in the home under the plain view doctrine because "the discovery of the firearms was a direct result of the incriminating statements Mr. Wilkins made." [R. 37 at 7.] The discovery, he argues, "has to be

inadvertent." [R. 34 at 107.]  Indeed, the Supreme Court once required the discovery of evidence in plain view to be inadvertent.  *See Coolidge*, 403 U.S. at 469.  But the Supreme Court has since eliminated this requirement.  *See Horton*, 496 U.S. at 128.  Even though inadvertence is often a characteristic of plain-view seizures, it is no longer required.  *See United States v. Clancy*, 979 F.3d 1135, 1139 (6th Cir. 2020); *see also United States v. Bonds*, 12 F.3d 540, 571 n.29 (6th Cir. 1993) ("[A]ny discovery of incriminating evidence in plain view, whether or not the officer expects to find it in the course of a search, is admissible.") (citing *Horton*, 496 U.S. at 128).  Thus, the plain-view doctrine permits the warrantless seizure of the firearms despite Mr. Wilkins's statement to police about the firearms.[3]

## III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Billy Wilkins's Objections **[R. 37]** are **OVERRULED**,

2. Judge Stinnett's Report and Recommendation **[R. 35]** is **ADOPTED** as and for the opinion of the Court, and;

3. Defendant Billy Wilkins's Motion to Suppress **[R. 25]** is **DENIED**.

---

[3] The Report notes that the inevitable discovery exception may also except the seizure from the warrant requirement. [R. 35 at 11 n.4.]  However, the Report did not fully consider the argument because the United States failed to raise the issue.  Accordingly, this Court too will not decide whether the inevitable discovery exception applies.

This the 1st day of November, 2022.

Gregory F. Van Tatenhove
United States District Judge