UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Crim. No. 5:22-cr-00016-GFVT |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| BILLY J. WILKINS, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Billy Wilkins was found guilty following a jury trial in which his ex-girlfriend testified for the United States. Afterwards, she recanted some of her testimony. Because the circumstances surrounding the recantation are highly suspect, the Court will **DENY** the Defendant's Motion for a New Trial **[R. 155]**.

**I**

In late 2021, police began investigating 216 Richmond Avenue as a possible hub of drug activity. [R. 164 at 16–18.] Surveillance revealed significant foot traffic at the residence, with incoming visitors staying only momentarily. *Id.* at 18–28. Officers also observed Defendant Wilkins leaving the home and conducting exchanges with visitors in their vehicles. *Id.* at 21–22. Finding these observations to be indicative of drug trafficking, law enforcement obtained a search warrant.

Upon execution of the warrant, police found Defendant Wilkins and his then-girlfriend (Heather DePew) inside the home. *Id.* at 77–78. Although the house belongs to DePew, Wilkins had been living there since 2020. [R. 165 at 52–53.] The couple were escorted to the porch while officers searched the residence. [R. 164 at 77–78.]

On the porch, Defendant Wilkins advised that synthetic marijuana and a revolver would be found inside the home. [R. 165 at 106–07.] He also cautioned that DePew had nothing to do with these items. *Id.* at 106. Contemporaneously, Wilkins began insisting that he needed to use the bathroom. [R. 164 at 92–93.] Suspicious of this proclamation, officers decided to search the bathroom. *Id.* In the bathtub, they found a coffee can with a false bottom. *Id.* at 96–97. The coffee can, obscured underneath a heap of clothes, contained "large amounts of narcotics." *Id.* Testing would later reveal that the narcotics included pure methamphetamine, heroin and fentanyl (mixture), and cocaine. [R. 166 at 21–22.]

Officers moved on to the bedroom, where they found $2,806 cash under a pillow, and a Glock 40 handgun underneath the sink in the connected bathroom. [R. 164 at 60–61; R. 165 at 11–13.] The Glock was loaded and chambered. [R. 165 at 14–15.] Three loaded magazines were found with it. *Id.* A loaded handgun and a box of ammunition were also located inside an ottoman. [R. 164 at 88–91.] Wilkins later placed a recorded jail call, wherein he stated that police had kicked in his door, and that he "had everything" with him. [R. 164 at 36 (Government Exhibit 38); R. 169 at 3.]

DePew testified at trial pursuant to an agreement that the United States would not use her trial testimony against her. On the day the warrant was executed, DePew testified, she and Wilkins heard a "banging at the door" and then "screaming." [R. 165 at 58.] The Defendant tossed the coffee can at her and "told [her] to hide it." *Id.* at 59. She threw it back to him because she "didn't want to be in trouble." *Id.* at 60. DePew was a cocaine user at the time, and she procured her cocaine from the Defendant's coffee can. *Id.* at 60–62. She also advised that she had previously observed "powdery stuff" inside the coffee can. *Id.*

2

DePew recounted that "guests" would come over to the house "maybe a couple times a week." *Id.* at 63–64. When those guests arrived, she observed Wilkins "handing them drugs." *Id.* On other occasions, she testified, she witnessed Wilkins leaving the house to meet the visitors at their cars. *Id.* at 65.

On direct examination, she was asked about her observations of the Defendant when he met with visitors at their vehicles. She testified, "I didn't watch him every time he left the house to know exactly what he's doing." *Id.* at 65. DePew continued, "that's all I've seen. Maybe a couple times he would do that, when he would leave the house. I wouldn't look out the window and see what he was doing. You know, I made a note that he would walk out the door." *Id.* The United States followed up: "Did he tell you why he was going outside to meet people?" *Id.* at 66. She responded, "No." *Id.*

On cross-examination, defense counsel inquired more directly: "did you ever see him carry that gun outside the house?" *Id.* at 107. "Maybe one or two times," she recounted. *Id.* at 108. However, she added, "I just didn't watch and see what Billy was doing all the time[.]" *Id.*

On re-direct, the United States asked "where was [the Defendant] going with [the gun]?" *Id.* at 133. DePew advised, "he stepped outside for a minute." *Id.* "To do what?" *Id.* "I don't know. I wouldn't . . . sit there and follow him. I don't know." *Id.* Eventually, DePew recalled that Wilkins would occasionally leave with the firearm to meet people parked outside the house. *See id.* at 135 ("**Q.** I'm talking about the times you've seen him go out briefly with the firearm, was he meeting people outside? **A.** Yeah.").

Following a three-day jury trial, Defendant Wilkins was found guilty of possession with intent to distribute methamphetamine, possession with intent to distribute fentanyl, possession

3

with intent to distribute cocaine, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a prohibited person. [R. 148.]  After the guilty verdict, Wilkins conversed with DePew on recorded jail calls.  On the calls, DePew recanted her trial testimony about watching Wilkins leave the house and/or go outside with a firearm to meet visitors.  *See, e.g.*, Jail Call 2 at 7:22 ("I don't remember you leaving the house with no gun."); Jail Call 1 at 4:03 ("When did I ever watch you walk out the f*cking door, ever?  Never.").  The Defendant now moves for a new trial on the basis of her recantation.  [R. 155.]

At a Motion Hearing, the Court considered arguments from both parties.  [R. 175.]  The Court has also listened carefully to these recorded calls, during which DePew was persistently coaxed and cajoled by Wilkins.  Here are some examples of the pressure exerted by Wilkins during these calls:

> **Wilkins:** You have to tell my lawyer that [unintelligible] was not true.  You have to tell them that was not true.  You have to.  You love me, right?  You said you love me.  [Jail Call 3 at 13:34.]
>
> **Depew:** I just don't want to talk no more, I'm afraid I'm going to get in trouble.
> **Wilkins:** [N]ow that it's over, you can't get in trouble.  So you need to tell [my lawyer] that [the United States] made you say what you said.  You need to tell them the truth.  Only the truth will set me free . . . .  Do you not understand that?  [Jail Call 1 at 9:55.]
>
> **Wilkins:** I love you to death . . . with all of me.  And for [the United States] to make you do something or make you say something, kills me, within myself.  It hurts me. . . . Cuz' I would never lie. . . . You have to tell my lawyer that [your testimony] was not true.  That was not the truth.  You have to.  [Jail Call 2 at 00:26.]
>
> **Wilkins:** You have to tell them the truth, that you've never seen me, you know that you've never seen me, take no gun out of that house.  [Jail Call 3 at 12:02.]

And in addition to these particular examples (of which there are myriad more), a holistic consideration of all three calls (totaling over 45 minutes) reveals much pressuring, begging, and cajoling from Wilkins.

4

## II

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Defendant bears the burden of establishing grounds for a new trial. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994). Motions for a new trial based on the recantation of a material government witness are governed by the *Gordon* test:

> [A] motion for a new trial based on the recantation of a material government witness should be granted only if:
>
> (1) the court is reasonably well satisfied that the trial testimony given by the material witness is false;
>
> (2) without the false testimony, the jury might have reached a different conclusion; and
>
> (3) the party seeking the new trial was taken by surprise when the false testimony was given, and was unable to meet it or did not know of its falsity until after the trial.[1]

*United States v. Willis*, 257 F.3d 636, 642–43 (6th Cir. 2001) (citing *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir. 1949)).

In assessing the first element, district courts have looked to the following (seemingly non-exhaustive) factors: did the witness have an incentive to lie? *Willis*, 257 F.3d at 646 (affirming district court's grant of new trial). Was the witness frightened that she would be accused of crimes if she did not testify against the defendant? *Id.* Did the court have "concerns about the veracity of the [witness's] [] testimony" during the trial? *Id.* Was the timing of the witness's testimony suspicious? *Id.* Is the veracity of the post-trial recantation "bolstered by the

---

[1] As for the third element, the Sixth Circuit has held that "the satisfaction of the final element of the [] test is not a condition precedent to the defendant receiving a new trial." *Willis*, 257 F.3d at 648. *See also id.* ("The U.S. Court of Appeals for the Seventh Circuit, the circuit that first developed this test, has also openly questioned the importance and necessity of the surprise element of the test."); *Gordon*, 178 F.2d at 900 (explaining that when "*all of the testimony*" has been recanted, the third element of the test is not "pertinent") (emphasis added).

fact that [it] "open[s] the way for perjury and possibly drug charges to be brought" against the witness? *Id.* at 647.

The Sixth Circuit has cautioned that "affidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion." *Id.* at 645 (internal citation and quotations omitted). Hence, it stands to reason that unsworn recantations warrant "even more suspicion because they are one step removed from a direct sworn recantation[.]" *United States v. Scott*, No. 14-CR-20780, 2018 WL 2159916, at *16 (E.D. Mich. May 10, 2018) (assessing a sworn "report of a purported unsworn recantation").

Finally, for reasons that will become apparent, the *Barlow* newly discovered evidence test may prove relevant to Wilkins's Motion. *See United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982) ("In making a motion for a new trial based on newly discovered evidence the defendant must show that the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried.").

## A

First, both parties agree that the *Gordon* test applies to the request for new trial on the possession of a firearm in furtherance of drug trafficking charge. [R. 155 at 5; R. 169 at 9.] But under *Gordon*, the Motion fails at the outset; the Court is not reasonably well satisfied that DePew's trial testimony was false. Or stated another way, the Court does not believe the recantation was true.

To be sure, DePew recanted some of her testimony on the calls. *See, e.g.*, Jail Call 2 at 7:22 ("I don't remember you leaving the house with no gun."). But as the aforementioned examples show, she did so in response to significant emotional pressure from Mr. Wilkins. A

6

holistic review of the calls reveals that Wilkins consistently questioned, challenged, and coaxed DePew until she gave an answer that satisfied him. Against this backdrop, the Court must decide which is more credible: DePew's unsworn statements on the jail calls or her sworn testimony at trial. *See United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991) (district court was "uniquely qualified to pass on [witness's] credibility" when "district court had the opportunity to observe [witness's] demeanor and assess his credibility [] at trial") (superseded by statute on other grounds); *see also Willis*, 257 F.3d at 649 ("[T]he district court, the trier of fact, is in a far superior position to judge the credibility of the witnesses and the evidence presented at trial, and to decide whether a new trial is needed to avoid the substantial risk of an injustice.").

      For starters, there is a presumption in favor of the veracity of sworn statements. *See, e.g., United States v. Lewis*, 338 F.2d 137, 139 (6th Cir. 1964) ("Where the newly discovered evidence consists of recantation of testimony given at the trial, such recantation is looked upon with the utmost suspicion[.]") (internal quotation and citation omitted). At trial, Ms. DePew knew she was testifying under oath. She also knew that her immunity deal with the United States was contingent upon her provision of truthful trial testimony. In the context of *Gordon* motions, even *sworn* affidavits are viewed with extreme suspicion. That suspicion is further "heightened when the recanting witness is a family member and the witness may have feelings of guilt or may be influenced by family members seeking to change the witness's story." *United States v. Coker*, 23 F. App'x 411, 412 (6th Cir. 2001) (citing *Willis*, 257 F.3d at 646). Of course, DePew is not a family member. But her status as Wilkins's ex-girlfriend (who clearly loves him) brings these guilt and influence concerns into full force.[2] *See Hicks v. United States*, No. 1:09-CR-61, 2012 WL 12964799, at *2 (W.D. Mich. Oct. 26, 2012) ("While it is not clear that a

---

[2] This clearly the case where, as here, the witness stated on the recordings that she felt guilty.

7

girlfriend is literally a 'family member,' a boyfriend/girlfriend relationship is the type of close relationship that *Knickerbocker* and *Willis* worried could give rise to the possibility of a false recantation."); *see also Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 433 (6th Cir. 2007). Those already serious concerns are only exacerbated by the emotional pressure exerted, and by the fact that the recantations are unsworn.

Of course, trial was not a stress-free environment for DePew, either. She has stated multiple times that she felt coerced by the United States to give the testimony she did. Therefore, it seems fair to say that she felt pressured in both contexts: by the United States at trial and by the Defendant on the phone. But the bottom line is this: in one of these contexts, she was under oath and subject to cross-examination. In the other context, she was not.

Further, her testimony at trial made logical sense: she was living with the Defendant, and they shared a bedroom. It stands to reason that—if the Defendant were armed and leaving the house to confer with individuals outside—she would probably notice. It is common (and almost unavoidable) to notice the habits of one's live-in partner, even when one is not intentionally monitoring those habits. Nor was DePew's house so large as to preclude such an observation. Accordingly, her jail call assertion that she *never* witnessed Wilkins leaving their shared house strains common sense.

"The question here is not whether [DePew] changed h[er] story. That [much] is obvious." *Cleveland v. Bradshaw*, 65 F. Supp. 3d 499, 523 (N.D. Ohio 2014). Rather, the issue is whether the Court is reasonably well satisfied that her trial testimony was false. It is not. Accordingly, (and even assuming DePew was a material witness), the Defendant has not carried his burden of establishing grounds for a new trial. Because his new trial request on the possession in furtherance of trafficking count fails at the first element, the Court need not address the

8

remaining elements.[3] *See United States v. Bass*, No. CRIM. 11-20704, 2014 WL 526146, at *4 (E.D. Mich. Feb. 10, 2014) ("[T]he Court is not required to reach the second or third requirements, given its finding as to the first requirement of the *Gordon* test[.]").

### B

Next, the Court will address the Defendant's request for a new trial on the remaining four counts. [R. 155.] Admittedly, it is not obvious to this Court (or to the parties) whether that request is governed by *Barlow* or *Gordon*. Of course, the Sixth Circuit has indicated quite clearly that motions for a new trial based on a material government witness's recantation are analyzed under *Gordon*. The difficulty here is that DePew only recanted certain specific portions of her testimony. And her recantation does not seem to go directly to these remaining counts. Thus, Wilkins appears to move for a new trial on these remaining counts pursuant to the general credibility concerns generated by the fact of an extant recantation. Are such credibility issues properly analyzed as a recantation under *Gordon*? Or do they constitute newly discovered evidence under *Barlow*? The Sixth Circuit has not addressed the issue directly.[4] In any event, "[t]he Court need not resolve this [question] because [Wilkins's] Motion falls short under either standard." *United States v. Turner*, No. CR 18-53-DLB-CJS-1, 2021 WL 1230481, at *2 (E.D. Ky. Mar. 31, 2021).

---

[3] The parties dispute whether the third element of the *Gordon* test need be met by the defense. Because the first element of the test has not been satisfied, the Court need not delve into the applicability of *Gordon*'s third element.
[4] However, the Sixth Circuit's explanation of the policy justifications for each test is instructive. It has cautioned that the more stringent *Barlow* standard may be appropriate when there are "concerns that defendants might sandbag the prosecution, waiting to see if they are convicted before bringing forth new evidence in an attempt to get a second chance at acquittal." *Willis*, 257 F.3d at 644. Conversely, "[i]n cases like *Gordon* . . . these sandbagging concerns are not at issue. Instead, the fear in a [recantation] case . . . is that the defendant, his friends, or his family have reached the witness after trial and convinced him to recant his damaging testimony." *Id.* at 645. If the Court did have to decide the issue, it seems likely that *Gordon* would apply. This case does not involve a prototypical example of newly discovered evidence like, for instance, recently uncovered DNA evidence.

For all the reasons stated previously, the unsworn recantation is merely impeaching under *Barlow*. *See United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) ("Mere impeachment evidence[] is not sufficient to warrant a new trial."). And as the Court has already explained, the Motion similarly fails under the more lenient *Gordon* test. Accordingly, the Court will also deny the request for a new trial on these remaining counts.

Finally, Mr. Wilkins seeks an evidentiary hearing in which Ms. DePew would be questioned again under oath. The Court is not sure how such a hearing would be helpful and will therefore deny the request. *See United States v. Monie*, No. CRIM.A. 05-37-DLB, 2008 WL 89877, at *12 (E.D. Ky. Jan. 8, 2008) ("A hearing is less necessary, however, when the district court already has observed and assessed a recanting witness during the trial.").

### III

"The granting of a defendant's motion for a new trial is a substantial remedy that must be exercised with caution." *Willis*, 257 F.3d at 649. A loved one's unsworn recantation, made under significant emotional pressure, is not a basis for that remedy. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendant's Motion for a New Trial **[R. 155]** is **DENIED;**

2. The United States' Request for a Status Conference **[R. 176]** is **GRANTED**;

3. The United States' Motion for Forfeiture **[R. 161]** is no longer held in abeyance;

4. A telephonic scheduling conference is hereby **SCHEDULED** for **Friday, September 13,** at the hour of **4:00 p.m.**; and

5. To join the teleconference, the parties are **DIRECTED** to call CMS Teleconferencing at 1-606-371-5577 and enter Meeting ID 295 150 240 (followed by #).

This the 9th day of September, 2024.



Gregory F. Van Tatenhove
United States District Judge

10